Smith, Herman J., J.
Introduction
Plaintiff, Sileshi Woldemariam (“Woldemariam”) brought this action against defendant, Pilgrim Parking (“Pilgrim”) after his employment was terminated with Pilgrim. Woldemariam claims that Pilgrim unlawfully terminated him from his position because of his handicap in violation of G.L.c. 15IB. The matter is now before the Court on defendant’s Motion For Summary Judgment. For the following reasons, the defendant’s motion is ALLOWED.
Background
The following facts are either undisputed or considered in a light most favorable to the plaintiff. In July 2002, Pilgrim hired Mr. Woldemariam as a supervisor at Museum Towers Parking (“Museum Towers Parking”) , a City of Cambridge parking facility. He supervised other Pilgrim employees who provided essentially valet services. Soon after he started working he was transferred to another parking facility in Boston, called Lansdowne Street Parking (“Lansdowne Parking”) and then shortly after to another parking facility, named Bayside Expo Parking (“Bayside Expo Parking”). At Bayside Expo Parking he was promoted to an assistant manager. After seven or eight months at Bayside Expo Parking he was transferred back to Lansdowne Parking where he remained in his position as an assistant manager.
*537 Both at Bayside Expo Parking and Lansdowne Parking Mr. Woldemariam supervised parking attendants. His duties included collecting cash from attendants[1] and completing daily reports of the parking facility’s cash activity. If a cashier did not show for his shift, Mr. Woldemariam filled the role of the cashier. At times, he performed cleaning, snow removal, and maintenance tasks.[2] Pilgrim argues that the maintenance activities such as cleaning and snow removal were not required of Woldemariam but of cleaning personnel. However, Woldemariam testified that, although the day attendants were responsible for cleaning, he and the manager would often voluntarily assist in the cleaning because the staff was small and busy.
At Lansdowne Parking Woldemariam reported to manager David Ridge (“Ridge”) and at the Bayside Expo Parking he reported to manager Scott Charlton (“Charlton”). The general manager, Eric Roderick (“Roderick”), was responsible for overseeing both of these facilities as well as others.
In their affidavits, the managers stated, among other things, that Mr. Woldemariam was unable to effectively manage employees and the parking facilities. Ridge stated that Woldemariam demonstrated poor management skills and had difficulty interacting with other employees and managers. Also, Ridge said that he received more customer complaints about Woldemariam than about other assistant managers working at the parking facility. According to Ridge the complaints often concerned poor customer service, lack of cleanliness of the faciliiy, and unpleasant odors in the garage. Charlton echoed Ridge’s observations in stating that Woldemariam lacked management and communication skills. Charlton added that Woldemariam had difficulty handling the fast-paced environment at Bayside Expo Parking in that “he worked very slowly and did not have the ability to multitask.” Because of Woldemariam’s deficits, Charlton assigned him cash-handling tasks, but found that Woldemariam was especially slow at counting and reconciling cash. General Manager Roderick also stated that Woldemariam lacked management and communication skills. In fact, Roderick explained that Woldemariam’s transfers were due in part to his inability to meet the expectations of the assigned location.
Woldemariam asserts that he satisfactorily performed his duties and further points out that he never received any warnings, poor performance reviews, or other communications about any work-related issues. Further, Woldemariam notes that transfers were commonplace among staff.
In September 2003, Woldemariam received a performance appraisal that overall rated him as having a “very good, above average performance that exceed[ed] the job’s requirements.” The appraisal pinpointed his weaknesses as (1) flexibility; (2) communicating with employees; and (3) understanding [the] chain of command. The performance appraisal pointed out that Mr. Woldemariam needed to improve his managing skills to fit changing circumstances. His strengths were listed as (1) dependability; (2) loyalty; and (3) honesty.
In October 2003, Roderick offered Mr. Woldemariam a manager position at another parking facility in the City of Cambridge, named Central Square Parking (“Central Square Parking”). According to Roderick, Central Square Parking would require limited management, had a low volume of business, and few cash handling requirements. In short, being a manager at Central Square Parking would be a better fit for Woldemariam, given his skill set. Woldemariam refused this transfer because it did not involve a pay increase. Woldemariam disputes whether the parking faciliiy required less cash activity and points out that the transfer was optional.
On November 28, 2003 Woldemariam reported that he fell from a ladder while at work. Ridge had asked him to reattach a wind barrier which had become disconnected from a fence. The ladder slipped and Woldemariam fell to the cement below injuring his hands. After falling, he went back to work and did not seek medical treatment until after he had completed his shift. He had x-rays taken of both hands, was given medication for inflammation, and a splint for his right hand. He returned to work at his next shift and worked without any restrictions in his duties, as he requested none. However, because of his injuries, he could not and did not perform any of the physical labor-intensive maintenance tasks that the managers would routinely volunteer to do because of the shortage of maintenance personnel.
Between November 26, 2003 and December 4, 2003, Ridge, Roderick, and Pilgrim’s Vice President of Operations, Steve Hender (“Hender”) claim that they began reevaluating the staffing and business needs at Lansdowne facility. Ultimately, they decided that Ridge would work days and the assistant manager position would be eliminated. Because they did not have available positions at other parking facilities they decided to lay off Woldemariam. As Ridge’s vacation time was scheduled from December 20-30, 2003, they decided to wait until after the New Year’s to lay off Woldemariam. While Ridge was on vacation, Mr. Woldemariam assumed some of Ridge’s managerial responsibilities.
On December 31, 2003, Woldemariam had a doctor’s appointment where his doctor told him that both of his wrists were broken and gave him a splint to wear on his left wrist. Later that day, Woldemariam met with Ridge to return his beeper. He claims that he informed Ridge that day that he was suffering from broken wrists and that, in addition to the splint he was then wearing, he would be wearing a cast. At no time during this conversation or at any time that day did Ridge tell Woldemariam of the decision to lay him off *538 that management made sometime between November 26 and December 12, 2003.
On January 5,2004 (Woldemariam’s first shift after the New Year’s holiday), Ridge informed Woldemariam that Pilgrim was eliminating the daytime manager position at Lansdowne Parking facility and that he was being laid off, effective January 23, 2004. Woldemariam asked to work the night shift but Ridge told him that the position was already filled. Woldemariam asserts that Ridge and Pilgrim provided him with no other information beyond the details of the lay-off. Pilgrim disputes how much Ridge knew of the nature and extent of Woldemariam’s injuries before he informed Woldemariam of the lay-off. Ridge claims that Woldemariam did not tell him about his wrists being broken until after the conversation about the lay-off.
Woldemariam continued to work at Lansdowne Parking even after he received his cast. His injured left arm became progressively weaker and more painful. Finally, in early January 2004, Woldemariam obtained a note from his doctor in which the doctor ordered a restriction on Woldemariam’s work activities. On January 14 or 15, 2004 Woldemariam gave Ridge this doctor’s note restricting his work activities. This was the first time that Woldemariam provided any medical documentation supporting his claim of injury. The note stated that Woldemariam should not return to work until after further evaluation of his wrists on January 28,2004. After immediately taking one or two days off from work, Woldemariam returned to work on his own, in spite of his doctor’s instructions. At no time did Woldemariam ask his supervisors for an accommodation for his injury. However, whenever Woldemariam asked for assistance in performing any task involving physical labor, a co-worker would help him, including from time to time, Ridge. In addition an attendant, who worked the same shift as Woldemariam, assisted him on a regular basis whenever he needed the help.
In July 2004 Mr. Woldemariam filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (“MCAD”) against Pilgrim alleging that Pilgrim terminated his position because of his handicap and that Pilgrim had failed to accommodate his handicap.
DISCUSSION
Summary judgment should be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1939). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17. The court will interpret all inferences in the light most favorable to the non-moving party. Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 438 (1995). In a discrimination case, it is generally disfavored to take the question out of the jury’s hands because “the ultimate issue is often of intent, and is a factual question.” Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 16 (1998) (citation omitted).
1. Shifting Burdens of Proof in Handicap Discrimination Cases
Massachusetts General Law Chapter 15IB, §4(16), provides, in pertinent part:
[It shall be an unlawful practice] [f]or an employer ... to dismiss from employment ... or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer’s business . . .
Massachusetts courts have used two different standards to determine the burdens incumbent upon each party in handicap discrimination cases. The standards Massachusetts courts employ were first created in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Pushkin v. Regents of University of Colorado, 658 F.2d 1372 (1981). In McDonnell, a race discrimination case, the Supreme Court set forth a standard which placed upon the complainant the initial burden of demonstrating a prima facie case of discrimination. Id. at 802. Once the complainant established a prima facie case, the burden would then shift to the employer to articulate a legitimate, nondis-criminatoiy reason for the employer’s rejection of the employee. Id. If the employer could offer a legitimate reason for rejecting the employee, the complainant would then have the burden of proving that the employer’s stated reason for the rejection was merely a pretext for discrimination. Id. at 804.
The McDonnell standard was later rejected in Pushkin, a handicap discrimination case. The court in Pushkin held that complainants would not have to show pretext in handicap discrimination cases because “it would be a rare case indeed in which a hostile discriminatory purpose or subjective intent to discriminate solely on the basis of handicap could be shown.” Pushkin at 1385. The court instead created the following standard for cases involving handicap discrimination;
1) The plaintiff must establish a prima facie case by showing that he was an otherwise qualified handicapped person apart from his handicap, and was rejected under circumstances which gave rise to the *539 inference that his rejection was based solely on his handicap;
2) Once plaintiff established his prima facie case, defendants have the burden of going forward and proving that plaintiff was not an otherwise qualified handicapped person, that is one who is able to meet all of the program’s requirements in spite of his handicap, or that his rejection from the program was for reasons other than his handicap;
3) The plaintiff then has the burden of going forward with rebuttal evidence showing that the defendants’ reasons for rejecting the plaintiff are based on misconceptions or unfounded factual conclusions, and that reasons articulated for the rejection other than the handicap encompass unjustified consideration of the handicap itself.
Id. at 1387.
Thus, to establish a prima facie case of handicap discrimination pursuant to G.L.c. 151B, §4(16), a plaintiff must produce some evidence that: (1) he is handicapped and is a qualified handicapped person within the meaning of the law; (2) that he could perform the essential functions of the job with or without reasonable accommodations; and, (3) that he experienced an adverse employment action as a result of the handicap. Russell v. Cooley Dickenson Hosp., Inc., 437 Mass. 443, 449 (2002). As part of the prima facie case, the plaintiff need not show “that he was terminated (or received some other adverse treatment from his employer) ‘solely’ because of his handicap.” Dartt v. Browning-Ferris Industries, Inc., 427 Mass 7-8.
2. Prima Facie Case of Handicap Discrimination
Here the plaintiff has submitted sufficient evidence to meet the elements of his prima facie case of handicap discrimination. First the plaintiff does not need to produce evidence that he is a qualified handicapped person because pursuant to G.L.c. 152, §75B(1), “Any employee who has sustained a work-related injury and is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of such job with reasonable accommodations, shall be deemed to be a qualified handicapped person under the provisions of chapter one hundred and fifty-one B.” Contrast Hallgren v. Integrated Financial Corporation, 42 Mass.App.Ct. 686, 686 n.2 (1997) (held that a knee injury which plaintiff recovered from in a month and had no residual disability did not amount to a handicap or make a person a handicapped individual within the meaning of G.L.c. 151B; the application of G.L.c. 152, §75B was not considered).
Second, Woldemariam has submitted sufficient evidence to raise a triable issue whether he was qualified to perform the essential functions [with or without reasonable accommodations] of the job. The essential functions of Woldemariam’s job was managerial. The physical labor was incidental to his essential job and was performed only because of a shortage of custodial staff. While Pilgrim has put forth ample evidence that Woldemariam was not fully qualified to perform his managerial functions, notwithstanding the injury to his wrists, the evidence is not conclusive. Woldemariam can still reasonably show that he could perform the essential functions of the job by pointing to his mixed but partially favorable performance review. Thus whether Woldemariam could perform the essential functions of his managerial position with or without reasonable accommodations is a disputed question of material fact. Further, whether Woldemariam’s job transfers were because of his poor performance or merely a function of commonplace job transfers among the employees at Pilgrim is also a disputed question of material fact. And whether the decision to lay off Woldemariam was based on decisions prior to and exclusive of Woldemariam’s work-related injuries is a question of fact. While Pilgrim may be able to show that the reasons put forth contributed to or were the reasons for Woldemariam’s termination, “credibility issues, particularly those delving into an actor’s state of mind, cannot be resolved on summary judgment.” See Petsch-Schmid v. Boston Edison Co., 914 F.Sup. 697, 704 (1996). Thus, this Court finds that at this stage of the litigation, Woldemariam has met his prima facie case as to this element.
Third, it is not required that the employer know the precise nature of the impairment to have discriminated against the employee. Id. It is enough that Woldemariam was perceived to be handicapped. He was laid off on January 5, 2004 when he was wearing a cast on one hand and a splint on the other.
In short, Woldemariam has presented enough evidence to establish a prima facie case of discrimination. The analysis must now move on to the next stage.
3. Defendant’s Burden to Articulate a Legitimate, Nondiscriminatory Reason for Its Decision to Terminate Plaintiffs Position
Once the plaintiff has established a prima facie case of discrimination, the burden shifts to defendant Pilgrim
to articulate a legitimate, nondiscriminatory reason for its hiring decision and to produce credible evidence to show that the reasons advanced were the real reasons ... The defendant’s burden of production is not onerous . . . The reasons given for a decision may be unsound or even absurd, and the action may appear arbitrary or unwise, nonetheless the defendant has fulfilled its obligation . . . The defendant is not required to persuade the fact finder that it was correct in its belief. . . Once the defendant meets its burden, the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant’s proffered reason for its employment decision was not the real reason, but is a pretext for discrimination . . . The plaintiff bears the burden of persuasion on the *540 ultimate issue of discrimination, . . . and therefore must produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination ... If the defendant’s reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail.
Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 128 (1997) (citations and quotations omitted).
Pilgrim has articulated nondiscriminatory reasons for laying off Woldemariam, namely that Woldemariam’s managerial skills were inadequate in certain respects, as indicated by the mixed performance review in September 2003, and that the reevaluation and reorganization of the staffing and business needs at the Lansdowne Parking facility which resulted in the elimination of the daytime assistant manager position and leaving no open position for Woldemariam, required it. Woldemariam does not contend nor is there any evidence supporting such a contention that Pilgrim laid him off because he could not perform the non-managerial physical labor that all of the managers would do from time to time to assist the custodial staff. In short, the evidence supports Pilgrim’s contention that its decision to lay off Woldemariam was a purely business decision and not related in any way to plaintiffs injured wrists.
4. Woldemariam’s Burden to Demonstrate Pretext
Finally, the question remains whether Woldemariam has shown that the reasons offered by Pilgrim are pretexts. While Woldemariam has put forth evidence questioning the employer’s reasoning for terminating him, and the timing of the lay-off, he has not presented enough, if any, evidence suggesting discriminatory intent. While in a discrimination case a plaintiff can meet his ultimate burden through circumstantial evidence, the plaintiff must submit some evidence tending to show that the employer’s reasons for terminating him were pretexts. See Wooster v. Abdow Corp., 46 Mass.App.Ct. 665, 670 (1999) (“[T]he plaintiffs ultimate burden of persuasion may be satisfied either by direct or circumstantial evidence of discrimination”). In Wooster, the Appeals Court found enough evidence to support a handicap discrimination claim where the plaintiff showed conflicting evidence of satisfactory performance combined with remarks about controlling employee health care costs and not hiring people who were “insurance gobblers.” Id. at 668-70. In contrast, Woldemariam has offered no evidence, whether direct or circumstantial, of any statements or actions by any of his supervisors or co-workers tending to show discriminatory intent. See generally Tardanico v. Aetna Life & Casualty Co., 41 Mass.App.Ct. 443, 448-50 (1996) (age discrimination case where plaintiff did not show evidence of pretext).
While the timing of the lay-off may be suspicious, it does not on its own support an inference of discrimination. As Handrahan v. Red Roof Inns, Inc., 43 Mass.App.Ct. 13, 15-17 (1997), was a close case and had more evidence of pretext, it is unavailing to the plaintiff. In that case, the Appeals Court upheld the trial judge’s ruling that the defendant’s articulated reason was a pretext. There the plaintiff received generally favorable evaluations but routinely failed to comply with unwritten time limits in cleaning rooms. After disclosure of her epilepsy, she continued to receive warnings for not meeting the cleaning time limits and ultimately was terminated. At trial, there was conflicting testimony from some of the personnel about whether there was a certain time limit (30 minutes) for cleaning rooms. The foregoing evidence, though slim, was enough for the juiy to reasonably infer that the time limits were “a new rule implemented and enforced only after the defendant learned of the plaintiffs handicap.” Id. at 18. There also was another co-worker alleging handicap discrimination that joined the plaintiff in her action. Id. at 14 n.l.
In contrast, Woldemariam simply has not put forth any such evidence of pretext to survive summary judgment as in Handrahan where there was more evidence warranting a finding of pretext.
5. Reasonable Accommodation
In connection with the plaintiffs failure to demonstrate that Pilgrim’s reasons for laying him off from his job are pretextual, Woldemariam has failed to show that Pilgrim ever refused to reasonably accommodate his wrist injuries. The plaintiff admits that he never asked his manager or the Pilgrim for an accommodation because of his injured wrists. Further, he admits that whenever he asked for help, other co-workers and, at times, the manager would help him with work tasks. When Woldemariam sought time off from work because of his injured wrists, Pilgrim immediately granted his request, but the plaintiff returned to work a couple of days later of his own volition and, critically, did not seek any accommodation. Woldemariam’s failure to request reasonable accommodation is fatal to his claim that Pilgrim did not reasonably accommodate his disability. See Russell v. Cooley Dickinson Hospital, Inc., 437 Mass. 443, 456 (2002) (“[I]t is the employee’s initial request for an accommodation which triggers the employer’s obligation to participate in the interactive process of determining one” (quotations and citations omitted)).
ORDER
For the foregoing reasons, it is ORDERED that defendant Pilgrim Parking’s Motion for Summary Judgment be and hereby is ALLOWED.

Mr. Woldemariam asserts that he did not collect cash from attendants at Lansdowne Parking. See Woldemariam deposition at 51-52.

The cleaning and maintenance activities involved activities that required lifting and carrying heavy items. The bags of garbage were very heavy and sometimes required two people to carry the bags. The snow removal involved carrying 40-60 pound bags of salt. See Woldemariam deposition at 52-57.